# MACFARLAND *v.* MEAD.

---

### CONTRACTS; REFORMATION; EQUITY.

A court of equity will not reform a written contract at the instance of one of the parties, who executed it under mistake of fact as to a material term thereof, without the procurement or knowledge of the other party, the only remedy where the minds of the parties have not met, being rescission or cancelation; and the rule applies with especial force where the party who executed the contract under mistake, having discovered the mistake and applied to the other party for its correction, which is refused, performs the contract according to its terms, and then asks to have it reformed.

No 2032.   Submitted December 10, 1909.   Decided January 4, 1910.

HEARING on an appeal by the defendants, the Commissioners of the District of Columbia, from a decree of the Supreme Court of the District of Columbia, sitting as an equity court, in a suit to reform a contract.                    *Reversed.*

The COURT in the opinion stated the facts as follows:

This is a suit by John A. Mead and George W. McCastin, trading under the firm name of John A. Mead & Company, to correct a contract made with Henry B. Macfarland, Henry L. West, and J. N. Morrow, the commissioners of the District of Columbia, and to recover for certain materials furnished and work done thereunder. Testimony was taken before the court on the hearing and is set out in the record. The material part thereof shows the following facts: Sometime prior to March 24th, 1905, the commissioners advertised for proposals for the erection of certain coal and ash handling machinery for use in connection with a sewage pumping station in the city of Washington. They furnished certain specifications to bidders, which gave general information in respect of the character of the work, stating that each bid should cover complete equipment for the erection desired. A series of proposals were invited under two general schemes; among these was proposal 10 in scheme 2. On March 24th, 1905, complainants submitted a proposal, which commences as follows: "We hereby propose to furnish, deliver, and erect on, but exclusive of all necessary and suitable excavations, foundations, and structural supports other than hereinafter specified to be furnished and erected complete by us, and ready for operation at the sewerage pumping station, etc., the coal and ash handling machinery fully equipped and substantially as described in your general specifications and in our detail specifications and drawings presented herewith and forming a part of this proposal as follows." This is followed by schémes 2 and 3, embracing different proposals. For proposal 10 in scheme 2 it was said: "Our price to cover scheme No. 2, using roller flight conveyer and double roll crusher, is $17,123." The specifications relating to scheme 2 were general, i. e., were not in detail. A drawing was transmitted, which is described as showing in red color the arrangement proposed. This drawing has been reproduced in the record, and is relied on by the complainants as excluding an offer for certain work for which they claim compensation in this suit.

The commissioners notified complainants of the acceptance of the bid No. 10, and on April 25, 1905, their sewer superintendent wrote, asking complainants to send four copies of detailed specifications and description of the coal handling machinery as submitted in bid 10, as the same was required to enable the contract to be prepared. Complainants prepared and forwarded four copies of detailed specifications, as requested. In those relating to the conveyer appear the words involved in the controversy. Relating to steel trough for carrying line it states it will be 3/16 steel plate, bent, etc., and "arranged to be attached to, but not including any structural work for support of, the same." Relating to trackway, it gave the character of the iron, and then added the same words quoted above. The assistant engineer of the District, who had charge of the particular matter, discovered these words in the specifications, and struck them out, inserting the following, "and including supports for the same." These were then transmitted to the commissioners, to be attached to the contract. The contract was executed by complainants in New York, and by the commissioners in Washington under date of June 24, 1905, the altered specifications aforesaid being attached to and made a part of it. It also contained the general specifications relating to the work as advertised for bids originally. These showed that the District was to furnish the plant to which the special machinery was to be connected, with all ordinary structural work necessary to give access, etc., to the same, and followed with this clause: "Connections with the same, including foundation and other bolts and drills for same, brackets, hangers, frames, plates, rails, guides, and all necessary materials and means for securing same, and all appurtenances and all incidental work and material necessary for the complete equipment, will be furnished as part of the contract, whether shown on the bidder's plans or not, and no extra compensation will be allowed." There seems to be no doubt, from their evidence, that complainants intended, by their drawings, to exclude the structural supports. But it also appears that the assistant engineer did not so understand. He understood from the general

specifications referred to above and the clause in proposal 10, referring to complete equipment, that the structural support was included.  Therefore, as he testified, he made the changes in the detailed specifications.  He testified that he did not understand that it was expressly intended by complainants to exclude that part of the equipment, but made the changes to avoid any possible controversy in the future.  There was some correspondence between the parties relating to other features of the contract, and some changes were made before the execution.  The commissioners did not notify the complainants of alterations aforesaid in the specifications, and they (complainants) testify that, relying on the acceptance of their bid, with the drawing, they did not read the detailed specifications when returned with the contract, supposing that they were the same.  The contract provided for completion of the work not later than December 31, 1905, with some provisions for extension under certain conditions.

The 15th clause of the stipulations made part of the contract, and under which bids were made, provided that proposals for machinery of different type from that outlined in the general specifications, and provisions for coal handling machinery only, or for separate machinery for both coal and ashes, will be considered.  On November 27th, 1905, complainants addressed a letter to the commissioners, calling attention to the changes that had been made in the specifications,—a fact which they had recently discovered,—and stating that they had not discovered it earlier, or else would have written sooner.  They demanded that correction should be made.  To this the engineer commissioner replied December 5, 1905, and we quote therefrom as follows:

"Having reference to your communication of November 27, and to a visit from your representative yesterday, I have to state as follows:

"The only point about which there might be a discussion would be as to what might be called the frame supporting the trough, as the structural part proper for the bridge will be furnished by the District, as appears on the drawing sent you.

"When your proposal was first submitted, there was a lack of detail about it, which caused us to write to you for further information, in which it was stated that none of the structural iron or steel would be furnished by your company. In order to avoid any misunderstanding with reference to this frame, the specifications were changed in the contract before being sent you to sign. In this change it was stated that the supports would be furnished by you.

"From the drawings which have been furnished you, indicating the bridge in place, it was thought by this office evident that this only referred to the frame supports, and that it would be so .understood by you. It was also clearly believed by this office that no contract would be signed by you without your going over it carefully, as is the custom here. There was, of course, no intention whatever to have you sign anything without knowing thoroughly what you were doing. In your printed illustrations of your plant as furnished to us, the frame work is indicated; in the proposals of the other bidders this frame work is also included. This frame work is different with the different kinds of conveyers, and therefore, in my opinion, would be obviously a part of the equipment furnished by the contractor who furnished the movable parts.

"It may be that there is a misunderstanding on your part as to exactly what you are to furnish, and you may intend to furnish this frame work, but, if not, it is evident to me that either this frame work must be furnished by you or else your contract with the District of Columbia must be annulled."

Complainants replied to the foregoing on December 22, 1905, reviewing at length the history of the proposals, their understanding of the same, and their execution of the contract under mistake.

January 27, 1906, the engineer commissioner replied to the foregoing, asking as preliminary to the consideration of complainant's claims, that they furnish a statement of amount they would charge for furnishing the structures claimed as not intended to be included in the contract, also what would be the cost to install the belt conveyer referred to in original proposal,

including all structural supports except what was clearly shown on the blue prints issued by the District with the original specifications under which bids had been received, in lieu of the roller flight conveyer required by the contract. Complainants replied, February 13, 1906, submitting the cost as requested. The first was named as $18,710; the second as $18,950. March 14, 1906, the secretary of the commissioners, under their directions, addressed the following letter to the complainants:

"Gentlemen: Referring to the recent correspondence relative to the question of furnishing structural supports under your contract for coal handling equipment at the sewage pumping station, in this city, the commissioners direct me to inform you that you must comply with the terms of the contract as signed by you, or it will be annulled, there being no question whatever about what is required under the contract as signed. It appears that the cost to the District of installing the roller flight conveyer, under the modified proposal of your company, is $750 more than the price of the next lowest bidder, who left no question as to the inclusion in his proposal of all the mechanical supports necessary. It would obviously be unfair to this bidder, as well as to the financial disadvantage of the District, to allow you the additional cost involved. Please inform the commissioners at your earliest convenience whether you will carry out the contract as signed by you or whether you desire to have it annulled."

In reply on March 20th, 1906, complainants denied that the additional cost would make their bid higher than the next lowest bid received, stating that they had been present at the opening of the bids, and had seen them all. This letter concluded as follows: "Further answering this communication, we beg leave to inform you that we have already incurred a great expense in preparing to carry out the contract, and we propose to carry out and perform same, fully according to its true meaning and intent, which we understand and advise would include all labor and material set forth in the type-written specifications submitted by us, which are made, by the very language of the contract, a part of it."

On March 22, 1906, they wrote again to the commissioners, stating, in substance, a desire to go on and complete the work, without prejudice to their right to claim the additional charge for the structural work. The commissioners closed the correspondence on March 29, 1906, with the following letter:

"Gentlemen:—In reply to your letters of March 20 and 22 regarding your contract for coal discharging, weighing, and handling equipment for the sewage disposal plant in this city, and referring particularly to your statement that you consent to furnish the structural supports referred to in said contract, provided that this is done with the distinct understanding and agreement on the part of the District that the furnishing of these supports shall in no way prejudice your position and your rights in the matter, and that you shall have the right to raise and test the question as to the meaning of the contract as fully and completely as if you had raised the question before the completion of the contract, and that if, upon the judicial determination of the matter, your contention that the structural supports are not included prevails, that you shall be entitled to claim, in addition to the contract price, the sum of $1,587 for the structural supports, I am directed by the commissioners to state that the contract is already signed by both parties thereto, and any interpretation of it such as you suggest would have to be made by the courts, and no action on the part of the commissioners, under the circumstances, could take away any right you may have to contest the interpretation of the contract, as placed upon it by the commissioners, nor could the commissioners agree in advance to pay such additional sum as you propose, as, if the matter comes up for judicial decision, the court will hear all parties interested and determine the matter on the evidence submitted.

"I am directed by the commissioners to inform you, however, that action on your part, whether to carry out the contract as signed or to refuse to do so, will have to be taken within five days from the date of this letter, as work on the sewage pumping station is being delayed by your failure to install the coal

handling equipment. If you will agree to proceed with the work under the contract, and to install a complete operative plant as indicated in the specifications of the contract as executed by you, securely connected to the various structures connected with the coal handling machinery installation, as shown on the general plans on file in this office prior to the reception of bids for the work, by means of foundation and other bolts, and drills for same, brackets, hangers, frames, plates, rails, guides, and all necessary materials and means of securing same, and all appurtenances, incidental work, and materials necessary for the complete equipment for the price named in the contract, this office will consider that you have carried out the terms of the contract, but if you do not agree to carry out the contract as executed, for the price named therein, within five (5) days from the date of this letter, the contract will be annulled."

The complainants thereafter performed the contract and were paid the contract price. They then began this suit, praying to have the mistake in the contract corrected, and for a decree for the extra material and work in putting in the structural supports, in the sum of $1,587, which is the amount in excess of the bid stated in their estimate of cost made, as before referred to, February 13, 1906.

Upon this testimony the learned trial justice expressed himself as follows: "I see no escape from the conclusion that, at the time this contract was signed, the District was expecting that it should receive these particular matters from the Mead Company, and the Mead Company was expecting that it should not supply them. In other words the minds of the parties were not in conjunction on the essential proposition." He further concluded that the Mead Company was excusable, under the circumstances, in signing the contract without reading the specifications carefully, and that it was entitled to have the contract reformed and to recover the cost of the structural work. Testimony was then introduced respecting the cost of this work. There was some conflict in this, unnecessary to mention, and the court assessed the same in the sum of $1,341.68. A de-

cree was then entered reforming the contract and for the payment of said sum, from which the commissioners have appealed.

*Mr. Edward H. Thomas,* Corporation Counsel, and *Mr. James Francis Smith* for the appellants.

*Mr. Henry F. Woodard* and *Mr. A. A. Birney* for the appellees.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

By reason of our conclusion in respect of the fundamental question involved in this case, it is unnecessary to consider whether the complainants are legally excusable for their failure to carefully examine the detailed specifications, as well as all other parts of the contract, before executing the same. It may be assumed that under all the circumstances, they are excusable. In the light of the undisputed evidence, we agree with the learned justice that there is no escape from the conclusion that there was material mistake of the parties in regard to the terms of the contract. There is no possible doubt that the commissioners understood and intended that the complainants should furnish the structural supports, and that they purposely altered the terms of the specifications, submitted by the complainants, to make them conform to that understanding and intention. On the other hand, it may be conceded that the complainants did not so understand or intend, and executed the contract in ignorance of the alteration.

It would seem that the commissioners ought, under all the circumstances, to have called the attention of complainants to the changes that had been made in the material terms, when they transmitted the contract for execution. Had they done so this controversy could not have arisen. But they were under no legal obligation to do so. Their omission was negligent, and there is no ground for suspicion, even, that they know of the

misapprehension of the complainants, and intended, fraudulently, to procure their execution of the contract under mistake. We have, then, a case where one of the parties, only, executed a contract under mistake in respect of a material term thereof, without the procurement or knowledge of the other. The only instance in which a court of equity will reform or correct a written contract on the complaint of one of the parties thereto is where, the material terms having been agreed upon, the contract in execution thereof, either through a mistake of fact common to both parties, or through the mistake of the complainant, accompanied with fraudulent knowledge of the defendant, fails to express the real agreement or transaction. Pom. Eq. Jur. ¶ 870. To reform the contract where only one of the parties has acted under mistake, and make it conform to his intention, would be unjust to the other party, who acted under mistake and took no advantage of the known mistake of the first. Where only one of the parties has acted under mistake of a material fact,—where, as stated by the learned trial justice, "the minds of both parties were not in conjunction on the essential proposition,"— the only remedy is rescission or cancelation. The rule of equity in respect of reformation applies with peculiar force to the complainant's case, as shown by the evidence. Having executed the contract under mistake, they were fully informed regarding it before they entered upon the construction of the words specified in the contract. They applied for correction of the terms, which was refused on the ground that there had been no mutual mistake as claimed. They then asked permission to enter upon the construction, without prejudice to their right to demand extra compensation for the disputed work. This was refused, and they were given the option to perform the work according to the terms of the contract, or to have the same canceled. After this unequivocal notification they proceeded to do the work. By way of excuse for their action, they say that they had gone to great expense in preparation for the work before the discovery of the mistake. The evidence relating to this expense is vague and indefinite; neither items of expense nor the gross amount were stated. Assuming that they had ac-

tually incurred considerable expense, and would have sustained damage by the cancelation of the contract, their persistence in performance, according to their own construction of its true meaning, was not justified thereby. The letter written them by the commissioners, heretofore quoted, makes it clear that the latter would not have permitted the contract to stand, or the work to be done, had they been advised that complainants would, after completion, demand reformation and extra compensation for the structural work. If complainants had any legal ground of complaint on account of the expense incurred they ought to have awaited the suggested cancelation of the contract, and then sought redress for their injuries in an action at law.

Whether they may have had any other remedy or not, it is quite clear that they are not entitled to the one sought in this suit. The decree will be reversed, with costs, and the cause remanded, with direction to dismiss the bill.                    *Reversed.*